UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAROLD L. MATTHEWS,

    Plaintiff,

v.

MARGARET OUELETTE,

    Defendant.

_____/

Case No. 1:16-cv-117

Hon. Gordon J. Quist

**REPORT AND RECOMMENDATION**

    This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. Plaintiff's claim involves alleged failure to treat a skin rash. This matter is now before the Court on defendant's motion for summary judgment (ECF No. 14). The motion is unopposed.

    **I.    Plaintiff's claims**

    Plaintiff is a prisoner incarcerated at the MDOC's Lakeland Correctional Facility (LCF). The defendant is Physician Assistant (PA) Margaret Ouellette. In his complaint, plaintiff claims that PA Ouellette was deliberately indifferent to his serious medical needs in treating a skin rash. Plaintiff's claims are set forth in ¶¶ 10-16 of the complaint (in his words):

> 10.    Plaintiff has been continually incarcerated under the supervision of the MOOC for over 10 years. He has never had any problems with his skin, groin and buttock areas during his incarceration.
>
> 11.    On or about July 29, 2014, Plaintiff developed a severe skin problem and he was seen by Defendant for this medical problem who informed him that he did not have "Scabies," but a simple "skin rash." Defendant issued a type of skin cream which did not stop the itching. burning sensation, pain, or the alligator skin scars, which are permanent.

> 12.   On November 26, 2014, Plaintiff was seen by Doctor Domingues on an emergency basis due to the severely skin irritation, and Dr. Domingues informed Plaintiff that he had "Scabies."
>
> 13.   On December 03, 2014, Plaintiff was seen by a Nurse Earl, who gave him blood tests. On this date, Defendant Ouellette refused to allow Plaintiff to be seen by Doctor Domingues, to properly diagnose the reason his skin was becoming like the skin of an "Alligator." [Scars all over his body and groin and buttock. legs and back areas].
>
> 14.   Prior to the December 03, 2014 date, Defendant Ouellette had issued Plaintiff some type of a cream, instructed him to put this cream on his genital area, which caused his pubic hair to fall out, irritation in his scrotum area, itching in his groin and buttocks, and severe skin scarring in his genital and buttocks and upper thigh areas.
>
> 15.   From the dates of July 29, to December 03, 2014, Defendant Ouellette refused to send Plaintiff to a skin Dermatologist because she insisted that Plaintiff did not have "Scabies" and the skin cream would solve the rashes. It did not and the (5) months without a skin specialist caused the skin to harden severely.
>
> 16.   Due to the five (5) month delay in providing treatment for "Scabies," Plaintiff's skin became severely scarred, the itching and burning continued whereby he could not sleep, the pain became worse when Plaintiff tried to stand up, and the skin scars spread and became permanent scar tissue all over his body, legs, arms, buttock/groin area, and his stomach and upper thigh area.

Compl. (ECF No. 1, PageID.4-5).

In Count One, plaintiff alleged that PA Ouellette violated his Eighth Amendment rights when she "deliberately misdiagnosed Plaintiff and provided a placebo medication to cover up her reckless disregard for Plaintiffs medical need, causing him continued pain and suffering." Compl. at PageID.6. In Count Two, plaintiff alleged that PA Ouellette violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs and inflicting cruel and unusual punishment "by the delay to cover up her reckless endangerment, and callous disregards for Plaintiffs acute medical condition." *Id*. In Count Three, plaintiff alleged that PA Ouellette's action "constitutes a deliberate indifference delay in providing medical treatment after learning of

the true nature of the skin condition which had been diagnosed by a Doctor as requiring special treatment to stop pain and suffering, scarring, and the permanent skin scarring . . . forcing Plaintiff to live in a continued state of severe pain and suffering, in a needless manner due to the delay and cover up for the reckless endangerment, to save her employer the expense of further medical treatment by a specialist in the field of skin Dermatology." *Id*. In Count Four, plaintiff alleged that PA Ouellette's delay in treating him for scabies violated his due process rights under the Fourteenth Amendment. *Id*.

## II. Defendants' motion for summary judgment

### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of

> production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, plaintiff's claims arise under the Eighth Amendment. It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

4

A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

**B.    Count Four**

In Count Three, plaintiff alleged that PA Ouellette's alleged delay in treating him for scabies violated Eighth Amendment rights. In Count Four, plaintiff alleged that this same conduct violated his due process rights under the Fourteenth Amendment. As a convicted felon in the custody of the MDOC, plaintiff's deliberate indifference claim is brought under the Eighth Amendment, not the Fourteenth Amendment. *See Miller v. Calhoun County*, 408 F.3d 803, 812 (6th

Cir. 2005) ("[a]lthough the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well") (internal citation omitted). Accordingly, plaintiff's Count Four should be dismissed as legally insufficient.

### C. Summary of plaintiff's treatment

Contrary to plaintiff's allegations, the medical record reflects that his skin rash was diagnosed and treated based upon examinations, laboratory tests, and a punch biopsy. PA Ouellette has attached 670 pages of medical records relevant to the treatment of plaintiff's skin rash between June 2014 and June 2016. *See* Medical Records (ECF No. 16-1, PageID.116-785). PA Ouellette summarized the relevant portions of plaintiff's records in a 30-page supporting affidavit (ECF No. 14-2).

On June 6, 2014, plaintiff submitted a health care request ("kite") complaining of itching on his body, but mainly his back. Ouellette Aff. at ¶ 15. A nurse saw plaintiff on June 6, 2014. *Id.* ¶ 16. The nurse saw a few tiny red bumps which plaintiff had scratched open. After cleaning wounds, the nurse told plaintiff not to scratch and gave him an antibiotic ointment and hydrocortisone cream. *Id.*

On July 14th, plaintiff reported to the nurse that the cream and soap were not effective and reported a rash on his bilateral buttocks and lower legs. *Id.* at ¶ 18. The nurse referred plaintiff to PA Ouellette, who saw him on July 17, 2014. *Id.* at ¶¶ 18-19. Plaintiff reported that the rash was red and itchy. *Id.* Contrary to the allegations in his complaint (i.e., "[h]e has never had any problems with his skin . . . during his [over 10 years of] incarceration"), plaintiff reported that the rash started two years ago. *Id.*; *see* Medical Records at PageID.127. PA Ouellette determined that it was

a mild rash, instructed plaintiff to apply lotion, and ordered lab tests (blood tests which may have suggested the causes of the rash), which showed no dermatological abnormalities. Ouellette Aff. at ¶¶ 19-22.

On August 4th, a nurse saw plaintiff for complaints that the rash was spreading to his buttocks, scrotum, back, right hand, legs, and arms. *Id*. ¶ 23. Plaintiff reported that an ex-girlfriend was positive for the Hepatitis B virus and requested testing. *Id*. Plaintiff denied changes in soaps or detergents, exposure to chemicals or allergies. *Id*. The nurse's examination showed scattered skin-colored papules, including on his right hand between the first and second finger, scattered skin-colored papules on his buttocks, the left upper thigh, the right upper thigh, the left hip, the scrotum, the lower back, the right leg, and the left arm. *Id*. The nurse's examination indicated that the rash was not infected. *Id*. After being advised of this development, PA Ouellette instructed the nurse to provide hydrocortisone cream, schedule a provider appointment, and instruct plaintiff to keep his hands and the rash areas clean and dry and not to itch or pick at his rash, and to clean his hands after applying the hydrocortisone cream. *Id*.

Plaintiff saw a Dr. Davis on August 8th. *Id*. at ¶ 24. At that time, plaintiff presented a different history, reporting that the rash began six year ago. *Id*.; *see* Medical Records at PageID.138 ("The patient presents for Dermatitis. This episode began 6 year(s) ago."). The doctor noted no drainage or redness, assessed it as chronic and nonspecific, and noted that it could be caused by nonspecific inflammation, HPV (warts caused by human papilloma virus), condyloma (genital warts), or acne. Ouellette Aff. at ¶ 24; Medical Records at PageID.139. The doctor prescribed betamethasone valerate cream (a stronger steroid topical medication), and noted that he would consider other causes if the cream was not effective. *Id*.

On August 16th plaintiff stated that he would be willing to pay for Hepatitis B testing. Ouellette Aff. at ¶ 25. PA Ouellette did not believe that the rash was related to Hepatitis B, because plaintiff exhibited no objective symptoms of that condition and the lab work showed no liver abnormalities. *Id*.

About 1 1/2 months later, on October 1st, PA Ouellette saw plaintiff for a followup. ¶ 26. Plaintiff described the rash as on his abdomen, arm and back. *Id*. Plaintiff also reported taking three showers a day. Ouellette conducted a fecal occult blood test (which was negative), discontinued the betamethasone (because plaintiff said it was ineffective), prescribed Vanos (a different corticosteroid), and instructed plaintiff not to take three showers daily. *Id*. Ouellette also ordered a punch biopsy of plaintiff's left upper back and right calf, which she performed on October 15th, and prescribed an antihistamine for plaintiff's complaints of itching. *Id*. at ¶¶ 26-27. The punch biopsy results suggested atopic dermatitis (eczema). *Id*. at ¶ 28; *see* Medical Records at PageID.653-654. Given plaintiff's history and the biopsy results, Ouellette concluded that "his rash may have been caused or exacerbated by excessive showering, which dries out the top layer of skin and may lead to drier skin and more itching." Ouellette Aff. at ¶ 12.

In a followup examination on October 29th, defendant exhibited a generalized rash on his abdomen, arm, back, leg, perineum, groin, penile shaft, and scrotum. *Id*. at ¶ 30. PA Ouellette renewed the prescriptions for Vistaril and Vanos, requested a cotton blanket to reduce skin irritation, requested another corticosteroid (clobetasol), and ordered photographs to be taken of plaintiff in anticipation of a dermatology consultation. *Id*. The next day, her requests for clobetasol and the cotton blanket were deferred by the MDOC's Chief Medical Officer. ¶ 31.

On November 26th, a nurse saw plaintiff for his skin complaints. ¶ 33. A doctor saw the patient, diagnosed him with scabies, and prescribed lice and scabies treatment. *Id*.

On December 2nd, PA Ouellette saw plaintiff for a followup. *Id*. at ¶ 34. Plaintiff reported that the itching was resolved after receiving the scabies treatment, but that the rash was worse. Upon examination, Ouellette noted a large, dry scaly area on plaintiff's right leg with scattered and weeping excoriations. She assessed him with poorly controlled dermatitis and ordered a follow up in one month. Defendant also submitted a request for a dermatology consult, noting that the rash had worsened over the past six or seven months. *Id*.

On December 3rd, Dr. Papendick determined that a dermatology consult was not indicated and recommended a different treatment, betamethasone valerate ointment (which contained a higher concentration of oil than cream). *Id*. at ¶ 35; Medical Records at PageID.194. That same day, PA Ouellette saw plaintiff for a followup, at which time he reported no change in the rash but swelling in his legs. Ouellette Aff. at ¶ 37. Commencing December 4th, plaintiff began receiving regular applications of betamethasone ointment. *Id*. at ¶¶ 39-45. On December 7th, a nurse noted that plaintiff's lesions were less raised, and on December 11th, the dark spots on his back were decreased in number. *Id*. at ¶¶ 41, 47.

On December 18th, PA Ouellette saw plaintiff for a followup. Ouellette Aff. at ¶ 46. Defendant assessed plaintiff with unchanged rash, renewed his betamethasone prescription, and requested a cotton blanket and Vaseline. Her requests were approved. When plaintiff reported to healthcare for application of the betamethasone ointment later that day, the nurse noted that his dark spots continued to fade. *Id*. Plaintiff was treated with betamethasone ointment and Vaseline in December 2014 and January 2015. *Id*. at ¶¶ 47-48. Ouellette noted that she was not aware of

9

plaintiff's day-to-day developments because the nursing staff did not forward his complaints to her. *Id*. at ¶ 47.

On January 21, 2015, plaintiff reported to PA Ouellette that the rash was improving and that the Vaseline and betamethasone cream were effective in relieving his rash. *Id*. at ¶ 49. However, Ouellette felt that improvement was minimal and prescribed a steroid (prednisone) to reduce inflammation and itchiness. *Id*.

At a followup appointment on March 4, 2015, plaintiff reported to PA Ouellette that his rash was improving. *Id*. at ¶ 53. Ouellette noted slight improvement, determined to continue the course of care, instructed plaintiff to "[a]void excessive showering" and scheduled a followup appointment. *Id*.; Medical Records at PatgeID.357.

On March 8, 2015, custody found plaintiff on the floor of the shower unresponsive. Ouellette Aff. at ¶ 55. Plaintiff was transported to an emergency room, where he received a CT scan of his head and x-rays of his chest and cervical spine, which indicated no significant abnormalities. He was discharged later that day. *Id*.

On March 9th, Dr. Dominguez-Bem performed a thorough examination and determined that plaintiff's loss of consciousness was likely caused by dehydration. *Id*. at ¶ 56; Medical Records at PageID.370-372. The doctor noted plaintiff's rash could be secondary to scabies, but did not order any treatment. *Id*. In her affidavit, PA Ouellette stated that "I am not aware of why [the doctor] did not order scabies treatment" and "as noted previously, a diagnosis of scabies was ruled out based on the patient's punch biopsy and ineffective scabies treatment." Ouellette Aff. at ¶ 56.

Plaintiff continued to receive treatment for his rash with Vaseline and betamethasone from March 2015 through May 2016. *Id*. at ¶¶ 57-98.[1] It was during this time period (i.e., February 3, 2016) that plaintiff filed this lawsuit.

During this period, PA Ouellette continued to interact with plaintiff. On July 15, 2015, Ouellette prescribed an antifungal medication for plaintiff's groin rash. Ouellette Aff. at ¶ 72. On September 15th, Ouellette renewed plaintiff's betamethasone ointment prescription. *Id*. at ¶ 76. On October 12th, Ouellette ordered that plaintiff be allowed to keep Vaseline on his person (to avoid having to go to health care for application) and discontinued the betamethasone ointment because his rash had improved and a temporary holiday from topical steroid use was indicated at that time. *Id*. at ¶ 79. On November 17th, Ouellette saw plaintiff for a follow up. *Id*. at ¶ 85. At that time, plaintiff had scattered red papules without drainage on his upper body which appeared to be a potentially infectious rash, so she prescribed an antibiotic. *Id*.

On February 15, 2016, PA Ouellette reviewed plaintiff's chart, prescribed betamethasone ointment, and scheduled a follow up appointment. *Id*. at ¶ 93. On February 22nd, Ouellette reviewed plaintiff's chart and requested Vaseline, which was approved. *Id*. at ¶ 94. On March 17th, Ouellette saw plaintiff for a follow up. *Id*. at ¶ 95. Plaintiff complained of a severe, red, itchy rash aggravated by lack of Vaseline and pain. *Id*. Ouellette issued Vaseline, ordered lab tests and scheduled a follow up appointment in two months. *Id*. On April 26th, she renewed plaintiff's betamethasone ointment. *Id*. at ¶ 96. Ouellette noted that at plaintiff's annual health screen on May 3rd, the nurse noted that plaintiff appeared stable, and had no genital lesions, lice or scabies. *Id*. at ¶ 97.

---

[1] The Court notes that plaintiff filed this lawsuit on February 3, 2016. *See* ECF No. 1.

On May 9th, PA Ouellette saw plaintiff on a follow up appointment, at which time plaintiff reported that he had improvement since using the Vaseline, that his rash was not itchy, and that he did not require the betamethasone ointment. *Id*. at ¶ 98. Plaintiff's fecal occult blood test was negative. *Id*. Defendant assessed plaintiff with improving dermatitis and instructed him to request refills of betamethasone ointment as needed. *Id*.

As an initial matter, plaintiff's allegation that "[h]e has never had any problems with his skin, groin and buttock areas during his [over 10 years of] incarceration" is contradicted by the medical records. In addition, plaintiff misrepresented his medical history to the providers, i.e., in July 2014 plaintiff told PA Ouellette that he had the rash for two years, while in August 2014 he told Dr. Davis that he had the rash for six years.

In summary, the record reflects that PA Ouellette provided plaintiff with ongoing treatment for his rash from July 17, 2014 through May 9, 2016. This treatment included a punch biopsy to determine the nature of the rash, prescribing a variety of medications, providing items to make plaintiff more comfortable (e.g., a cotton blanket to reduce itching and allowing plaintiff to have Vaseline on his person), and a request for a dermatology consult.

With respect to Count I, plaintiff's allegation that between July 29, 2014 and December 3, 2014, PA Ouellette "deliberately misdiagnosed" him and prescribed a "placebo" is not only unsupported by the medical record, but frivolous. As discussed, PA Ouellette examined plaintiff, ordered lab tests to determine possible causes of the rash, and performed a biopsy before concluding that plaintiff had dermatitis. She initially treated that condition with hydrocortisone cream. Dr. Davis concluded that plaintiff had dermatitis which began 6 years ago, noting that it could be caused by nonspecific inflammation, HPV, condyloma or acne. It was Dr. Davis (not PA

Ouellette) who prescribed the betamethasone valerate cream. The record reflects that PA Ouellette prescribed additional medications as indicated by the laboratory and biopsy results. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004).

With respect to Count II, there is no evidence to support plaintiff's claim that PA Ouellette was deliberately indifferent to his acute medical condition and delayed his treatment for scabies "to cover up her reckless endangerment." As an initial matter, the record does reflect that PA Ouellette was deliberately indifferent to plaintiff's condition or delayed treatment for scabies. Plaintiff's examinations, lab tests and biospy did not indicate scabies prior to Dr. Dominguez-Bem's examination on November 26, 2014, and neither PA Ouellette nor Dr. Davis concluded that plaintiff had scabies prior to that date. In short, plaintiff's providers had differing opinions on the cause of plaintiff's rash prior the November 26th examination. A difference in medical opinion is not actionable under § 1983. *Lane v. Wexford Health Sources (Contreator)*, 510 Fed. Appx. 385, 388 (6th Cir. 2013), citing *Estelle*, 429 U.S. at 107.

Assuming that plaintiff developed scabies at some point prior to November 26, 2014, even if PA Ouellette had misdiagnosed this condition, such a misdiagnosis is not actionable under § 1983. *See Farmer*, 511 U.S. at 835. In addition, plaintiff has presented no evidence to demonstrate that he suffered a detrimental effect from any delay in treating scabies. "[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment

13

to succeed." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir.2001). Assuming that plaintiff contracted scabies at some point prior to November 26, 2014, it did not resolve plaintiff's rash which had been afflicting him for two to six years. As discussed, on December 2, 2014, plaintiff reported to PA Ouellette that while his itching was resolved by the cream used to treat scabies, the rash was worse after the scabies treatment.

Furthermore, plaintiff has not established the subjective component of his Eighth Amendment claim. The record reflects that PA Ouellette not only examined plaintiff, but obtained a punch biopsy to determine the cause of plaintiff's skin problem. PA Ouellette's actions in diagnosing plaintiff's condition can hardly be described as evidence of the type of "obduracy and wantonness" sufficient to support an Eighth Amendment claim. *See Whitley*, 475 U.S. at 319.

Finally, with respect to Count III, there is no evidence to support plaintiff's allegation that PA Ouellette misdiagnosed plaintiff's condition and delayed treatment of "the true nature of the skin condition [scabies] which had been diagnosed by a Doctor as requiring special treatment . . . to save her employer the expense of further medical treatment by a specialist." Contrary to plaintiff's allegations, PA Ouellette began the process for obtaining a dermatology consult (i.e., taking pictures of plaintiff's rash) on October 29, 2014 - about one month before Dr. Dominguez-Bem's scabies diagnosis. PA Ouellette submitted the request on December 2, 2014, after determining that the scabies treatment did not resolve the rash. Nothing in the record suggests that the "special treatment" for scabies was so unique as to influence PA Ouellette's decision-making process. Rather, prison personnel treated plaintiff's scabies diagnosis with medication kept on hand at the prison. *See* Medical Records at PageID.173 (plaintiff's treatment included Pyrethrin Lice Treatment 4%- 0.33% Topical Liquid, with order to "Follow directions on package," and Permethrin

5%, with order to "Apply from head to toes and leave on 12-14 hours, then shower to remove the cream. Disp 1 from stock."). For these reasons, PA Ouellette is entitled to summary judgment.

### III.    Recommendation

Accordingly, I respectfully recommend that defendant's motion for summary judgment (docket no. 14) be **GRANTED** and that this action be **TERMINATED**.


Dated:  May 19, 2017                             /s/ Ray Kent
                                                 RAY KENT
                                                 United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).